IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40181-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| EDDIE JAMES DAVIS, | ) | |
| | ) | |
| Appellant. | ) | |

MURPHY, J. — A jury found Eddie James Davis guilty of second degree rape. He was subsequently sentenced to life imprisonment as a persistent offender. Davis appeals, alleging: (1) ineffective assistance of counsel when his trial attorney did not impeach the complaining witness with prior criminal convictions, (2) the trial court abused its discretion when it admitted testimony from a law enforcement officer about prior contact that officer had with Davis during a criminal investigation unrelated to Davis's charged crime, and (3) the trial court improperly imposed a sentence based on findings made by the sentencing court rather than a jury.

We affirm the conviction and sentence.

## BACKGROUND

Law enforcement responded to the women's mission at the Tri-City Union Gospel Mission in Pasco regarding the theft of a virtual reality headset. A resident at the mission's

homeless shelter reported the headset was missing and suspected her roommate, H.G.,[1]

had taken the headset. While questioning H.G. about the theft, H.G. disclosed she had

been raped by "Eddie" at the Tahitian Inn in Pasco. 1 Rep. of Proc. (RP) (Sept. 8, 2023)

at 270. The investigation shifted to the alleged rape. H.G. was not charged with the theft

of the headset.

Law enforcement went to the Tahitian Inn and confirmed through video

surveillance footage that H.G. had been inside Davis's room, noting the duration she

was in his room, and other comings-and-goings. Search warrants were executed to search

Davis's room and obtain a DNA sample from Davis. Davis was arrested and agreed to

speak with law enforcement. Davis conceded he had sex with H.G. but said it was

consensual based on an "agreement for sex," although the terms of the agreement were

not disclosed. 1 RP (Sept. 11, 2023) at 500. Once in custody, law enforcement utilized a

buccal swab to obtain a sample of Davis's DNA.

Concurrently, a sexual assault kit was performed on H.G. at a medical facility.

H.G. was interviewed about the sexual assault by law enforcement, with her person and

body photographed, and her clothing was collected as evidence.

---

[1] To protect the privacy interests of the victim in this case, we use her first and last name initials throughout the body of this opinion. Gen. Order 2023-2 of Division III, *In re Matter of Victim Initials* (Wash. Ct. App. Sept. 22, 2023), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2023_3&div=III.

Davis was charged with second degree rape. The State subsequently provided notice that, pursuant to the Persistent Offender Accountability Act (POAA), RCW 9.94A.030, .555, .570, it intended to seek a sentence of total confinement for life without the possibility of release.

## Defense theory of the case

In opening statements, both the State and Davis informed the jury that the facts would show that H.G. was a drug addict and transient.

Defense counsel went on to tell the jurors during opening that H.G. came to Davis's room to "score drugs" by way of exchanging sex for drugs. 1 RP (Sept. 8, 2023) at 256. As soon as H.G. secured drugs from Davis, she went into the bathroom and used them. When H.G. came out of the bathroom, she was acting "paranoid," and was "high" and "hallucinating." 1 RP (Sept. 8, 2023) at 257-58. "[T]hey tried to have sex but it [was] not happening." 1 RP (Sept. 8, 2023) at 258. When having sex did not work, Davis told H.G. she owed him money for the drugs and H.G. then left. "Within the hour she's being accused of stealing something. She owes [Davis] money. And she's busted stealing something." 1 RP (Sept. 8, 2023) at 258. "[W]hile she's explaining what happened, she says, 'And by [the] way, I was raped about an hour ago.'" 1 RP (Sept. 8, 2023) at 259. The defense theory was that H.G. only claimed she was raped to divert attention away from herself and the theft investigation.

3

Similar to opening statements, during closing argument Davis's counsel told the jury that the sexual assault allegation was made up by H.G. to divert law enforcement's attention away from the theft investigation, and the entire case was really about "[s]ex for drugs." 1 RP (Sept. 12, 2023) at 549-50.

## ANALYSIS

*Assistance of counsel*

On appeal, Davis argues his counsel was ineffective for not impeaching H.G. with her criminal history.

Prior to trial, the prosecuting authority disclosed H.G.'s criminal history, which included convictions for the following crimes of dishonesty: (1) attempted second degree theft in 2008, (2) taking a motor vehicle without permission in 2019, (3) third degree theft in 2022, and (4) attempted theft of a motor vehicle in 2022. A pending false statement charge was also disclosed. In a pretrial hearing, the State moved in limine to prohibit the introduction of any crimes beyond the 10-year time limit for admissibility in ER 609(b), and exclude reference to a pending criminal charge under ER 609(a) as there was, as yet, no conviction. Addressing all of H.G.'s disclosed prior criminal history, Davis's counsel responded to this motion in limine with the following:

> [DEFENSE COUNSEL]: Judge, *usually I don't dwell on crimes of dishonesty. I may ask a question if they have a conviction, and I don't get into the specifics of the conviction.*

4

> This particular case arose out of a theft investigation from [H.G.] that she was being investigated. I think both of us can agree that there's no way of getting out of that being brought forward.
>
> With that being in front of us, *I'm not going to—and I'll give proper notice if I end up changing my mind, which would mean simply thrown out there that there was another conviction, that 20% that I might do that. I will let the Court know and the state know, but very unlikely that I will bring those old ones in. I'll be content with the fact right there, the arrest was a theft, and I'll let the jury keep that as part of the dishonesty part, prong.*

1 RP (Sept. 6, 2023) at 9 (emphasis added).

Davis claims his counsel performed deficiently by "depriving the [j]ury from having a full picture of H.G.'s credibility." Appellant's Opening Br. at 24 (citing *Reynoso v. Giubino*, 462 F.3d 1099, 1118 (9th Cir. 2006)). Davis contends that, with a lack of physical evidence being present to support that he committed a crime, he was prejudiced at trial because the credibility of witnesses was a critical component to his defense, especially so because a conviction would be a third strike offense under the POAA. The State points out that it did not hide the fact that law enforcement's investigation in this case began with a theft allegation levied against H.G., and if Davis's counsel had cross-examined H.G. on her criminal history "[t]he jury may have viewed [H.G.'s] history of theft-related crimes not as a moral failing, but as the product of her [substance abuse] addiction. This could have created sympathy for her." Resp't's Br. at 10. The State takes the position that Davis's counsel was strategic in making a tactical trial decision to not

further attempt to discredit H.G. by going through her criminal history, and there was neither deficient performance by Davis's trial counsel nor any prejudice to Davis.

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail, Davis must satisfy the two-prong *Strickland* test. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see also State v. Jeffries*, 105 Wn.2d 398, 417-18, 717 P.2d 722 (1986) (quoting *Strickland*, 466 U.S. at 687). Under the first prong of *Stickland*, Davis must show defense counsel's performance was deficient by falling below an objective standard of reasonableness based on all circumstances. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011); *Strickland*, 466 U.S. at 688. Under the second prong, Davis must show prejudice through a reasonable probability that, but for defense counsel's deficiency, the outcome would have been different. *Strickland*, 466 U.S. at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Grier*, 171 Wn.2d at 34 (quoting *Strickland*, 466 U.S. at 694).

*First prong—deficient performance*

Davis must overcome the strong presumption that defense counsel's performance was reasonable. *See Grier*, 171 Wn.2d at 33-34. When defense "counsel's strategy can be characterized as legitimate trial strategy or tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). A defendant can "rebut the

presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach,* 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). "Not all strategies or tactics on the part of defense counsel are immune from attack." *Id*. at 33-34. "'The relevant question is not whether counsel's choices were strategic, but whether they were reasonable.'" *Id.* at 34 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000)).

Prior convictions for crimes of dishonesty, such as theft, are admissible to attack a witness's credibility. ER 609(a)(2). Here, Davis's counsel articulated in a pretrial hearing the intention, although qualified, to not impeach H.G. with prior convictions as a strategic choice. Defense counsel's theory was that the sexual encounter was consensual, focusing on the argument that drugs were exchanged for sex.

While defense counsel's failure to impeach H.G. with her prior convictions was clearly a conscious choice, it was not a reasonable choice in this case. Davis's theory of the case was that H.G. was lying about the rape to divert attention away from suspicion that she had stolen items from another person. Under these circumstances, we can conceive of no legitimate reason why counsel would not want to impeach H.G. with evidence that she had been previously convicted of two felony crimes of dishonesty.

The State contends that the choice to refrain from introducing H.G.'s criminal history was reasonable given the circumstances of this case. For example, the State argues that defense counsel may have been trying to avoid alienating the jury by appearing to attack a legitimate sexual assault victim. But this argument misses the point: defense counsel was trying to demonstrate that H.G. was not a legitimate sexual assault victim. The State also suggests that defense counsel may have wanted to refrain from being aggressive with an otherwise sympathetic witness. But questioning a witness on prior convictions for crimes of dishonesty does not have to be done in an aggressive manner. Impeaching a witness is not inherently aggressive.

In any event, defense counsel's stated reason for not impeaching H.G. with her criminal history was not linked to the facts of this case. At the pretrial hearing, counsel explained that it is their general practice to avoid introducing prior criminal history for impeachment purposes. But under the circumstances of this case, when the defense theory is based almost entirely on the veracity of one witness, we see no legitimate reason for failing to introduce evidence of prior convictions for crimes of dishonesty that would impeach that witness. That failure amounted to deficient performance.

*Second prong—prejudice*

Having determined that defense counsel's failure to impeach H.G. with her prior convictions for crimes of dishonesty was deficient performance, we conclude nonetheless

that counsel was not constitutionally ineffective because Davis fails to show this deficiency resulted in prejudice. Although H.G.'s history of convictions for crimes of dishonesty was not introduced into evidence, there was a significant amount of testimony elicited from H.G. that touched upon her credibility.

Not long into H.G.'s direct examination at trial, she confirmed that on July 28, 2022, she had been accused of theft of a virtual reality headset from another resident of the women's homeless shelter. "[A] gal at the shelter wanted me to sell her, her virtual reality set, to try and get drugs for her, but I wasn't able to do that, and she ended up saying that I stole it from her later on." 1 RP (Sept. 12, 2023) at 464. H.G. said she was "going to be arrested for that," 1 RP (Sept. 12, 2023) at 464, prior to making the disclosure to law enforcement about the rape. Davis's counsel, in cross-examination, successfully elicited testimony that H.G. "didn't want to tell [law enforcement] the truth" when questioned, and was not forthcoming when questioned by officers about the theft of the virtual reality headset. 1 RP (Sept. 12, 2023) at 482.

H.G. also admitted that, at the time of the incident with Davis, she was "a pretty heavy [drug] user," with fentanyl being her daily drug of choice. 1 RP (Sept. 12, 2023) at 461. On direct examination, H.G. agreed that her prolonged use of drugs affected her memory. H.G. testified that she was currently attending treatment and had been sober for almost one year. This was juxtaposed against her testimony on cross-examination that, on

9

the date of the incident with Davis, H.G. was in the throes of her "worst time[] of addiction," at which point she was four years into her addiction, and her agreement that she had "consumed drugs even before [she] went to Mr. Davis'[s] room." 1 RP (Sept. 12, 2023) at 478. Also on cross-examination, the jury heard H.G. talk about how while in Davis's room, she was grinding fentanyl pills to "smoke[] it on a foil," and "[i]t's a really heavy drug" that made her feel "a little bit impaired." 1 RP (Sept. 12, 2023) at 486-88.

This testimony was consistent with the defense theme that H.G. exchanged sex for drugs, as opposed to being raped. The jury heard that H.G. was a drug addict, with the addiction resulting in impaired memory, and that she was specifically impaired on the day of her interactions with Davis due to multiple instances of using drugs.

Relative to how she came into contact with Davis, H.G. told the jury on direct examination that she left the shelter, rode the bus to the Tahitian Inn, and began knocking on doors to look for her runaway daughter. H.G. did this because she received a tip that her daughter was at the Tahitian. One of the doors she knocked on was Davis's. When Davis opened the door, he invited her in. H.G. told the jury she was an acquaintance of Davis "through other friends and stuff before," but denied having ever bought drugs from him. 1 RP (Sept. 12, 2023) at 463. On cross-examination, H.G. continued to maintain that she "[j]ust knew of [Davis]" in passing, but later conceded she "had used drugs in a room before and [Davis] was there." 1 RP (Sept. 12, 2023) at 478-79.

10

On cross-examination, defense counsel questioned H.G. further on how she came to knock on doors at the Tahitian Inn looking for her daughter. H.G. said that her daughter, prior to being a runaway, had been at the Tahitian Inn before to see her dad and uncle. H.G. described that a person named "Shadow," who was now "deceased," told H.G. that her daughter had been seen at the Tahitian Inn. 1 RP (Sept. 12, 2023) at 479-80. When challenged on whether H.G. recalled giving an interview earlier in time and saying that it was her roommate at the shelter who told her that her daughter was at the Tahitian Inn, H.G. testified one of her roommates at the mission was friends with Shadow, and Shadow sometimes stayed at the Tahitian Inn, and H.G. learned about her daughter potentially being at the Tahitian Inn from Shadow through the roommate.

Through all of this testimony, the jury heard that H.G. associated frequently and regularly with criminal activity.

Because Davis does not establish prejudice under the second prong of *Strickland*, he fails to show that his counsel was ineffective.

*Law enforcement testimony and ER 404(b) evidence*

Davis argues the trial court abused its discretion by allowing a law enforcement officer to testify that he was aware of which room Davis rented at the Tahitian Inn from a prior investigation regarding a stolen vehicle that was unrelated to charged crime in this case. We review evidentiary rulings for abuse of discretion. *See State v. Burke*,

11

196 Wn.2d 712, 740-41, 478 P.3d 1096 (2021). Evidence of other crimes, wrongs, or acts are inadmissible to prove character or propensity but may be admitted for other purposes if the probative value outweighs prejudice. ER 404(b); ER 403.

Davis asserts that the trial court erred when it allowed irrelevant testimonial evidence from Officer Jeremy Pellicer of the Pasco Police Department about an unrelated criminal investigation. Davis claims this was an attempt to impugn his credibility. The State argues that the testimony did not relate to prior bad acts of Davis and merely showed the officer's basis for knowing Davis was already an occupant of room 167 at the Tahitian Inn.

We review a trial court's ruling to admit or exclude evidence of misconduct under ER 404(b) for an abuse of discretion. *See State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009) "A trial court abuses its discretion where it fails to abide by the rule's requirements." *Id.* "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

Defense counsel objected when the State asked Officer Pellicer how he knew Davis was an occupant of room 167 of the Tahitian Inn. Defense counsel's basis for objection was relevance and the State responded that the question went to the basis of

Officer Pellicer's knowledge. The trial court overruled the objection and Officer Pellicer

was allowed to answer the question:

> So a couple months prior to this, I often check the parking lot of the
> Tahitian [Inn] because it's a lower-cost motel, and it ends up that there are
> a lot of people with stolen vehicles and warrants who end up in the parking
> lot area of that motel. So I check it on a regular basis and run license plates
> to see if vehicles were stolen. And on one occasion I found a vehicle,
> because of its condition and everything, being [a] 90s model Hyundai,
> and some of the other factors about it, it looked like it could be stolen. And
> there was a male I saw get out of the vehicle and start walking away, and so
> I contacted him. I identified him and was asking about the vehicle, and he
> told me that, you know, there's nothing wrong with the vehicle or anything,
> and he said he was going to go to room 165 and hang out there with [Davis]
> if I had anymore questions for him. . . . [A]nd so the vehicle turned out it
> was stolen. We checked back the cameras and had [the person I had spoken
> to] driving the stolen vehicle. So I had probable cause at that time to arrest
> him for possession of stolen motor vehicle. So I went to room 165 to try to
> contact, recontact him, and found out that [Davis], that there's nobody in
> 165, and it was room 167 where [Davis] was living, and I contacted
> [Davis], and he said that that individual [from the parking lot] had not come
> to hang out with him at all. And so it appeared at that time [the person I was
> looking for] just told me that to give him a chance to leave the property as
> soon as we figured out that we had probable cause to arrest he wouldn't be
> there.
> . . . .
> I'd seen [Davis] hanging out near the doorway before, and then after this,
> this incident, I'd seen him come and go in and out of the door several times.

1 RP (Sept. 8, 2023) at 271-72.

The trial court did not abuse its discretion in allowing this testimony of Officer

Pellicer for two reasons. First, the testimony did not reveal any prior bad acts of Davis.

Officer Pellicer's testimony here was that he encountered Davis in room 167 of the

13

Tahitian Inn in the context of searching for a person Officer Pellicer encountered earlier

who had been driving a stolen vehicle. Davis was not a suspect in that crime. Second,

in the context of the investigation of H.G.'s allegation of rape by Davis, this testimony

explained how Officer Pellicer knew that Davis was living in room 167 of the Tahitian.

Officer Pellicer's testimony was not improper evidence that showed other crimes,

wrongs, or acts of Davis that would be inadmissible under ER 404(b). Even if it had,

the trial court did not abuse its discretion because Officer Pellicer's testimony regarded

knowledge, which is an explicit exception in ER 404(b).

*Sentencing*

Davis argues that the trial court improperly imposed a life sentence based on

findings made solely by the sentencing judge. Specifically, Davis argues that any fact that

increases his punishment must be found by a unanimous jury. He claims that the question

of whether he was convicted of two prior strike offenses for purposes of the POAA are

facts that are appropriately determined by a jury, not by a sentencing court. The State

responds that our Supreme Court has long held there is no entitlement to a jury

determination of prior convictions for POAA sentencing. We agree with the State.

### *Life sentencing under the POAA*

In this case, a jury convicted Davis, as charged, of second degree rape. The State

had provided pretrial notice to Davis that, pursuant to the POAA, if Davis was convicted

as charged it intended to seek a sentence of life imprisonment without the possibility of release. Approximately one month prior to sentencing, the State filed a sentencing memorandum that included certified copies of (1) a judgment and sentence for Davis's August 3, 2000, conviction for second degree assault and taking a motor vehicle without permission, and (2) a judgment and sentence for Davis's December 10, 2002, conviction for second degree assault. It was the State's position that these assault convictions and Davis's current conviction for second degree rape qualified as strike offenses for purposes of the POAA as most serious offenses.[2]

After reviewing the submissions of the parties and hearing argument, the sentencing court found that Davis's 2000 and 2002 second degree assault convictions qualified as strike offenses under the POAA. The sentencing court further found that Davis's current second degree rape conviction constituted Davis's third strike for POAA sentencing. Davis was sentenced to life without the possibility of parole.

Under the POAA, "[a]n offender who has been convicted of two strike offenses must be sentenced to life without parole upon conviction for a third such offense." *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 254, 111 P.3d 837 (2005) (citing former RCW 9.94A.120(4) (1998), *recodified as* RCW 9.94A.505 (LAWS OF 2001, ch. 10, §6));

---

[2] *See also* CP at 174 (Davis's criminal history within the Department of Corrections presentence investigation report).

15

*see also* RCW 9.94A.030, .561, .565, .570. Davis relies on *Erlinger v. United States*, 602 U.S. 821, 144 S. Ct. 1840, 219 L. Ed. 2d 451 (2024), to claim a jury, and not a judge, must determine whether he was convicted of two prior strike offenses before he can be sentenced under the POAA for his current conviction. Based on recent case law, this claim fails.

Prior to *Erlinger*, Washington had long held, for the purposes of POAA, that "a judge may find the fact of a prior conviction by a preponderance of the evidence." *State v. Witherspoon*, 180 Wn.2d 875, 892, 329 P.3d 888 (2014) (citing *State v. Manussier*, 129 Wn.2d 652, 681-84, 921 P.2d 473 (1996). It has been "repeatedly held that the right to jury determinations does not extend to the fact of prior convictions for sentencing purposes." *Id*. at 892-93 (citing *State v. McKague*, 172 Wn.2d 802, 803 n.1, 262 P.3d 1225 (2011*)* (per curiam); *Lavery*, 154 Wn.2d at 256; *State v. Smith*, 150 Wn.2d 135, 139, 75 P.3d 934 (2003)).

Since *Erlinger*, Washington's position remains that a judge may find the fact of a prior conviction. In *State v Frieday*, Jeremy Frieday argued, based on the *Erlinger* decision, that the trial court violated his rights under the Fifth and Sixth Amendments to the United States Constitution when a judge, not a jury, decided factual comparability of his prior convictions. 33 Wn. App. 2d 719, 742-43, 565 P.3d 139, *review denied*, __ Wn.3d __, 574 P.3d 539 (2025). Division Two of this court in *Frieday* agreed with

16

No. 40181-2-III
*State v. Davis*

Division One that *Erlinger* should be limited to resolving the Armed Career Criminal Act, a specific federal statute, and "does not overrule well-established Washington precedent." *Id.* at 745-47. Division One had previously stated that "*Erlinger*'s holding is limited to resolving [the] ACCA's occasions inquiry and does not overrule our state's well-established precedent" that the fact of a prior conviction can be determined by a judge even when used to increase a criminal sentence. *State v. Anderson*, 31 Wn. App. 2d 668, 681, 552 P.3d 803, *review denied*, 3 Wn.3d 1034, 559 P.3d 1013 (2024)).

We agree with the holdings in *Frieday* and *Anderson*, and reject Davis's argument that a jury, rather than the trial court, is required to determine whether he was convicted of two prior strike offenses. Washington's longstanding precedent that a judge may find the fact of a prior conviction for POAA sentencing remains unaffected.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Murphy, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Staab, J.

17